O

JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WRITERS GUILD OF AMERICA, WEST, INC.; MARK DiSTEFANO; and GUINEVERE TURNER,<br><br>  Plaintiffs,<br><br>  v.<br><br>BTG PRODUCTIONS, LLC,<br><br>  Defendant. | CV 14-05828 RSWL (AJWx)<br><br>**RULING AND ORDER RE: EVIDENTIARY HEARING** |

On January 29, 2018, the Ninth Circuit issued a Mandate regarding this Court's prior decision on whether Third Party Myriad Pictures, Inc. ("Myriad") qualifies as an alter ego of Defendant BTG Productions, LLC ("BTG"). The Court had previously denied Plaintiffs Writers Guild of America, West, Inc. (the "Guild"); Mark DiStefano ("DiStefano"); and Guinevere Turner's ("Turner") (collectively, "Plaintiffs") Motion

1

to Add Judgment Debtors on February 9, 2016, holding that Myriad was not an alter ego of BTG. The Ninth Circuit remanded the matter and ordered this Court to apply the alter ego test outlined in <u>United Ass'n of Journeymen & Apprentices Local 343 v. Nor-Cal Plumbing, Inc.</u>, 48 F.3d 1465, 1470-71, 1473 (9th Cir. 1995). <u>See</u> Mandate 2, ECF No. 49.

The Court held an evidentiary hearing on June 12, 2018 with both parties offering testimony and exhibits into evidence. Having received, reviewed, and considered the evidence presented, as well as the parties' arguments at the hearing and in their respective briefs, the Court makes the following ruling: **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Myriad is not an alter ego of BTG and therefore cannot be added as a judgment debtor.

## I. BACKGROUND

### A. <u>Factual Background</u>

The Guild is a labor organization within the meaning of 29 U.S.C. § 152(5), with its principal place of business in Los Angeles, California. Compl. ¶ 1, ECF No. 1. DiStefano and Turner are members of the Guild. <u>Id.</u> BTG is a California limited liability company formed on June 9, 2010. Decl. of Kevin Forester in Supp. of Myriad's Statement ("Forester Decl. II") ¶ 3, ECF No. 55-1. Third Party Kirk D'Amico ("D'Amico") is an individual and the sole owner of BTG. <u>Id.</u> BTG was formed to produce the motion picture at

issue—*Breaking the Girls*. Id.

At all relevant times, the Guild and BTG have been parties to the Writers Guild of America Theatrical and Television Basic Agreement ("MBA"), an industry-wide collective bargaining agreement between the Guild and various employers in the motion picture and television industry. Compl. ¶ 9. Article 10 of the MBA calls for the submission of disputes to arbitration, including disputes over failure to pay compensation due to credited writers and to make required contributions on behalf of writers to the Writers Guild-Industry Health Fund and the Producer-Writers Guild of America Pension Plan (collectively, the "Plans"). Id. ¶ 10.

In 2012, a dispute arose between Plaintiffs and BTG concerning BTG's failure to pay compensation owed in connection with *Breaking the Girls* to writers DiStefano and Turner (collectively, the "Writers"). Id. ¶ 11. On June 6, 2013, the Guild served BTG with a notice of claim submitted to arbitration, outlining the allegations that BTG failed to pay certain compensation owed to the Writers and failed to make the attendant contributions to the Plans. Id. ¶ 12. The arbitration hearing was held on February 12, 2014. Id. ¶ 15. BTG failed to appear at the hearing and had advised counsel for the Guild by phone a few days before the hearing that it did not intend to appear. Id.

On February 12, 2014, the arbitrator entered the award and judgment against BTG, requiring BTG to pay

3

Plaintiffs over $300,000 relating to credit bonus provisions in the Writers' contracts for *Breaking the Girls*. Id. ¶ 16. On February 14, 2014, the Guild served the award on BTG, which has refused and continues to refuse to comply with the terms of the award. Id. ¶ 17.

**B.  Procedural Background**

On July 25, 2014, Plaintiffs filed a Complaint [1] against BTG to confirm the arbitration award. On September 12, 2014, the Clerk entered default [14] against BTG. On October 30, 2014, Plaintiffs filed a Motion for Default Judgment against BTG, which included a Motion to Confirm Arbitration Award [17]. On February 3, 2015, this Court issued a Judgment [23], granting Plaintiffs' request for default judgment and confirming the award.

On October 21, 2015, Plaintiffs filed their Motion to Add Judgment Debtors [24], which sought to add D'Amico and Myriad as judgment debtors. On February 9, 2016, the Court denied Plaintiffs' Motion to Add Judgment Debtors in its entirety [36]. Plaintiffs appealed the Court's denial on March 3, 2016 [37]. Pursuant to the parties' stipulation, the Ninth Circuit dismissed the appeal as to D'Amico on October 14, 2016 [45].

On January 5, 2018, the Ninth Circuit issued its Memorandum [47] affirming in part and reversing in part this Court's denial of Plaintiffs' Motion to Add

4

Judgment Debtors. The Ninth Circuit affirmed this Court's holding that Plaintiffs' Motion to Add Judgment Debtors was timely. Mem. ¶ 2, ECF No. 47. The Ninth Circuit held that this Action involves a collective bargaining agreement, thus requiring the application of the federal rather than the state test for determining whether Myriad is an alter ego of BTG. Id. ¶ 1. The Ninth Circuit remanded for this Court to apply the alter ego test outlined in Nor-Cal. Id. The Ninth Circuit issued its Mandate [49] on January 29, 2018. The Court held an evidentiary hearing regarding the alter ego issue on June 12, 2018.

## II. DISCUSSION

**A. Legal Standard**

To prove that a non-union entity is an alter ego of a union entity, and thus subject to a collective bargaining agreement, a plaintiff must make a showing (1) that the two entities were a single employer "and (2) that the non-union firm is used 'in a sham effort to avoid collective bargaining obligations.'" Resilient Floor Covering Pension Fund v. M&M Installation, Inc., 630 F.3d 848, 852 (9th Cir. 2010) (quoting Nor-Cal, 48 F.3d at 1470).

"The criteria for determining whether two firms constitute a single employer are (1) common ownership, (2) common management, (3) interrelation of operations, and (4) centralized control of labor relations." Nor-Cal, 48 F.3d at 1471. No factor is controlling,

and not every factor must be present. Id.

The second prong of the Nor-Cal test has been defined in a number of ways:

> "whether [the non-union employer] was created in an attempt to avoid the obligations of [] [the union employer's] collective bargaining agreement through a sham transaction or a technical change in operations"; whether the non-union employer was used in a sham effort to avoid collective bargaining obligations; and whether some measure of fraud or misrepresentation exists.

Resilient, 630 F.3d at 852 (quoting Nor-Cal, 48 F.3d at 1470, 1472).

**B. Analysis**

1. Single Employer

   a. *Centralized Control of Labor Relations*

"The most important factor is centralized control of labor relations, which can be demonstrated either by showing common control of day-to-day labor matters or by showing that the person in charge of the union company's labor relations made the decision that the second company would be non-union." Nor-Cal, 48 F.3d at 1471 (internal citation omitted). At the evidentiary hearing, D'Amico testified that he and Kevin Forester, Myriad's chief operating and financial officer, were responsible for making hiring decisions for Myriad. D'Amico also testified that he generally controlled the decision-making for BTG and was involved in supervising the production of *Breaking the Girls*.

On the other hand, D'Amico testified that BTG hired Melissa Wiley, a non-Myriad employee, as the line

producer for *Breaking the Girls*.  In that role, Ms. Wiley was responsible for hiring and firing production employees and negotiating rates with vendors.  In addition to Ms. Wiley, Jamie Babbit (director of *Breaking the Girls*) and Andrea Sperling (independent producer of *Breaking the Girls*), who were also non-Myriad employees, worked with D'Amico to supervise the production staff working on *Breaking the Girls*.  Ms. Babbit and Ms. Sperling also provided notes to the writers of *Breaking the Girls*.  Ultimately, while D'Amico may have been involved in the day-to-day labor operations of both Myriad and BTG, there were at least three non-Myriad employees significantly involved in the day-to-day labor operations of BTG.  Therefore, this factor does not strongly weigh in favor of finding Myriad and BTG were a single employer.

    b. *Common Ownership*

 It is clear from D'Amico's testimony that BTG and Myriad have common ownership.  While Isabell Von Alvensleben owns thirty percent of Myriad, D'Amico owns the remaining seventy percent, and D'Amico is the sole owner of BTG.  Accordingly, this factor weighs in favor of finding BTG and Myriad were a single employer.

    c. *Common Management*

 "Under this factor, the court examines whether the entities have common officers, directors, and managers."  EEOC v. Con-Way, Inc., No. CV 06-1337-MO, 2007 U.S. Dist. LEXIS 66727, at *14 (D. Or. Sept. 4,

7

2007) (citations omitted). Further, "the court looks to whether the common officers or managers exert regular control, i.e. day-to-day, over the operations of both entities." Id.

It is clear that BTG and Myriad shared common officers, who were involved in the day-to-day operations of both companies. Mr. Forester testified that he served as the chief financial officer for both BTG and Myriad and was responsible for overseeing the finances for both entities. D'Amico testified that he and Mr. Forester share in the final decision-making for hiring employees at Myriad. D'Amico was also a decision-maker in the decision for BTG to hire Myriad as a sales representative, as well as the decision to hire the bond company.[1] D'Amico made the decision to hire the director of *Breaking the Girls*, Ms. Babbit, and the independent producer for *Breaking the Girls*, Ms. Sperling. Finally, D'Amico specifically admitted that he was in control of BTG.

Additionally, Craig Kessler worked in business and legal affairs at Myriad and was also responsible for hiring writers for *Breaking the Girls*. David Ducar was an officer of BTG and served as counsel for both Myriad and BTG, handling legal issues for both, including grievances BTG had with the Guild throughout the production of *Breaking the Girls*.

---

[1] The bond company guarantees completion of the film to various investors.

However, D'Amico testified that Ms. Sperling, who was under contract with BTG, not Myriad, was also responsible for hiring and firing BTG employees. Further, BTG had a line producer, Ms. Wiley, who was not an employee or officer of Myriad, and Ms. Wiley was involved in many of the day-to-day operations of BTG, including serving as the production liaison with the unions.

Ultimately, while BTG may have had non-Myriad employees managing some of its day-to-day operations, see Int'l Longshore & Warehouse Union, Local 40 v. Columbia Grain, No. 3:13-CV-00513-AC, 2014 U.S. Dist. LEXIS 136326, at *20 (D. Or. July 21, 2014) (noting lack of common management when "each company had its own 'general manager' who saw to each company's day-to-day operations"), Myriad and BTG shared a number of officers who were all involved in different areas of both entities' operations, see Haley & Haley, Inc. v. NLRB, 880 F.2d 1147, 1151 (9th Cir. 1989) ("Although the evidence did not conclusively demonstrate that the same individuals played a significant role in the day-to-day operations of both companies, there was substantial evidence to indicate that Larry Haley was a dominant figure in major as well as minor management decisions for both companies."). This factor thus weighs in favor of finding BTG and Myriad were a single employer.

///

d. *Interrelated Operations*

"Evidence relevant to a finding of close interrelationship of operations includes, but is not restricted to, shared use of office space, supplies and equipment, similar client base and operations, as well as any joint undertakings or financial relationships." Haley, 880 F.2d at 1151. In the 2011 Letter of Adherence BTG submitted to the Guild regarding BTG's adherence to the MBA, BTG listed Myriad's physical address as well as Myriad email addresses as the contact for BTG, thus suggesting BTG and Myriad shared office space. Pls.' Ex. 6. However, the 2011 Letter of Adherence also lists a production address different than Myriad's address and a non-Myriad email address for Ms. Wiley, the line producer for *Breaking the Girls*. D'Amico confirmed in his testimony that this separate production address was the address BTG used during the production of *Breaking the Girls*. Therefore, it would appear that BTG and Myriad did not share office space during the production of *Breaking the Girls*.

However, the invoices Myriad submitted to BTG for Myriad's services related to *Breaking the Girls* show a common address for both entities. Myriad's Ex. 4. The checks BTG wrote to Myriad for these services also show a common address for both entities. Myriad's Ex. 5. Further, Mr. Forester testified that in dealing with these invoices, he took them to another Myriad employee

10

in Myriad's office who signed the checks to Myriad on behalf of BTG. Therefore, Myriad and BTG's accounting business took place in the same office; Myriad did not even have to leave the office to get paid for the services it was providing to BTG.

BTG and Myriad did not at any point share bank accounts, and there has never been any commingling of funds. However, as noted in the Completion Agreement, which the bond company provided regarding financing of *Breaking the Girls*, Myriad did invest approximately $88,000 into BTG for the production of *Breaking the Girls*. Myriad's Ex. 12 at 2. Mr. Forester signed the Completion Agreement on behalf of BTG as its chief financial officer. Id. at 9. Mr. Forester also signed the Collection Account Management Agreement[2] on behalf of BTG, while D'Amico signed on behalf of Myriad. Myriad's Ex. 10 at 56. This intertwining of Myriad's and BTG's operations and officers evidences that this factor weighs in favor of finding Myriad and BTG were a single employer.

Because at least three of the four factors weigh in favor of finding Myriad and BTG are a single employer, Plaintiffs have satisfied the first prong of the Nor-Cal alter ego test.

///

---

[2] According to Mr. Forester, the Collection Account Management Agreement is provided by a third party who is responsible for receiving payments related to the film and then issuing account statements.

11

2. <u>Intent to Avoid Union Obligations</u>

While Plaintiffs have provided evidence sufficient to satisfy the first prong of the <u>Nor-Cal</u> test, Plaintiffs must still provide evidence to satisfy the second prong to successfully prove Myriad is an alter ego of BTG. <u>See</u> <u>Resilient</u>, 630 F.3d at 853 (holding that a plaintiff cannot prevail on an alter ego theory simply by showing the union and non-union entities are a single employer). Typically, the <u>Nor-Cal</u> alter ego test applies when a union entity creates a non-union entity to avoid its collective bargaining obligations with the union. <u>See</u> <u>id.</u> at 854. The Ninth Circuit has specifically held that the test "does not apply in the 'reverse' where a non-union employer creates a union company because the non-union employer has no collective bargaining obligations to avoid." <u>S. Cal. Painters & Allied Trades v. Rodin & Co.</u>, 558 F.3d 1028, 1033 (9th Cir. 2009). Importantly, under the alter ego doctrine, "a non-union company cannot be guilty of evading a collective bargaining agreement that it never entered into." <u>Id.</u>

This "reverse alter ego" scenario is the scenario here—Myriad, the non-union entity, was created in 1998, twelve years prior to BTG, the union entity. In such a situation, the Ninth Circuit has declined to recognize a "reverse alter ego doctrine," and instead only finds alter ego liability when there is "an indication that the union entity was using the non-union entity to

avoid union obligations." Id. Therefore, to add Myriad as a judgment debtor under an alter ego theory, Plaintiffs must provide evidence that BTG used Myriad to avoid BTG's union obligations.

Plaintiffs have not provided sufficient evidence showing that BTG used Myriad to avoid BTG's union obligations. While BTG and Myriad worked closely together in producing *Breaking the Girls*, there is no evidence that BTG transferred union work to Myriad to avoid any of BTG's union obligations. See id. ("[T]here is no evidence that [the non-union entity] diverted union work from [the union entity] at all, let alone that [the non-union entity] did so to help [the union entity] avoid [the union entity]'s obligations under the [collective bargaining agreement]."); Nor-Cal, 48 F.3d at 1472 (finding manager used the non-union entity "to do work that would have been performed by [the union entity] if [the non-union entity] had not been created"); see also Bds. of Trs. of the Cement Masons & Plasterers Health & Welfare Tr. v. Concreteman, Inc., No. C13-1698JLR, 2014 U.S. Dist. LEXIS 65253, at *12 (W.D. Wash. May 12, 2014) (noting potential for union animus when manager of union entity transferred all union work to non-union entity upon dealing with payment of benefits to union employee). In fact, BTG was created for the sole purpose of producing *Breaking the Girls*, while Myriad provides sales representative services to many movies and

13

currently has a library of around 110 films.  See
Rodin, 558 F.3d at 1033 (noting union entity never
generated the quantity of business that the non-union
entity performed—the union entity handled seventeen
jobs in the same time the non-union entity handled 2500
jobs).

Further, BTG was not wholly reliant on Myriad for
its existence; while Myriad performed sales
representative services for BTG and invested money into
the production, Myriad only invested approximately one-
tenth of the budget of the movie, and non-Myriad
employees, including Ms. Sperling, Ms. Wiley, and Ms.
Babbit, had a hand in managing the production.[3]  See
Resilient Floor Covering Pension Fund v. M & M
Installation, Inc., No. C08-5561 BZ, 2012 U.S. Dist.
LEXIS 26354, at *20 (N.D. Cal. Feb. 29, 2012)
(concluding that the union entity's "collective
bargaining obligations could only be met if [the non-
union entity] funded them").  BTG functioned
irrespective of Myriad and Myriad's finances; there was
no commingling of funds, Myriad did not receive the
profits of *Breaking the Girls*, and Myriad was only one
piece of the production puzzle, not the primary
investor and manager of the production.  Cf. id.
(noting union entity received all of its contracts and

---

[3] There were also another fifty non-Myriad employees who worked directly for BTG and made up the cast and crew of *Breaking the Girls*.

14

income from the non-union entity and the non-union entity took all of the union entity's profits for itself); Trs. of the Bricklayer & Allied Craftworkers Local 13 v. Commercial Union Tile & Stone, No. 2:15-cv-02129-APG-NJK, 2017 U.S. Dist. LEXIS 123782, at *5 (D. Nev. Aug. 4, 2017) (finding manager "operated the two entities to avoid [collective bargaining agreement] obligations by inflating [the union entity]'s bids by forty percent or more[,]" ensuring the non-union entity would win the bid).

Finally, it is hard to show how BTG could even use Myriad to avoid its union obligations, especially since Myriad was created so many years prior to BTG. Cf. Bd. of Trs. of the Pipe Trades Dist. Council No. 36 Health & Welfare Tr. Fund v. Clifton Enters., No. 11-05447 JST (JSC), 2013 U.S. Dist. LEXIS 77068, at *32 (N.D. Cal. May 31, 2013) (finding second prong satisfied when non-union entity "was established in an attempt to continue [union entity's] operations while avoiding [union entity's] liability for failure to abide by its collective bargaining obligations"). The truth of the matter is that BTG was capitalized to fund *Breaking the Girls*, but after the film did not do as well as the producers hoped, BTG ran out of money and did not have sufficient funds to pay the Writers of *Breaking the Girls* pursuant to their contracts. As single-purpose entities like BTG are common in the film industry, it would be illogical to expect any third-party entity

that works on a film to be liable for any remaining debts of the single-purpose entity after production of the film ends.  This is not the purpose the alter ego doctrine seeks to serve.  See Rodin, 558 F.3d at 1033 ("The alter ego doctrine was never intended to coerce a non-union company into becoming a union company by requiring its compliance with a collective bargaining agreement it never signed, with a union its employees never authorized to represent them.").

Because Plaintiffs have failed to provide evidence of BTG's intent to use Myriad to avoid BTG's union obligations, Plaintiffs have failed to satisfy the second prong of the Nor-Cal alter ego test.

### III. CONCLUSION

Based on the foregoing, the Court declines to find Myriad is an alter ego of BTG, and therefore, Myriad cannot be added as a judgment debtor.

**IT IS SO ORDERED.**

DATED: July 3, 2018  　　　　s/ RONALD S.W. LEW
　　　　　　　　　　　　　　**HONORABLE RONALD S.W. LEW**
　　　　　　　　　　　　　　Senior U.S. District Judge